# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**THE GOVERNMENT OF PUERTO RICO**

**Plaintiff,**

**v.**                                                    **Civil No. 18-1987 (GAG)**

**THE CARPENTER COMPANY, et al.,**

**Defendants.**

## OPINION AND ORDER

On December 20, 2018, the Government for the Commonwealth of Puerto Rico ("Government" or "Commonwealth"), in its *parens patriae* capacity and on behalf of the people of the Puerto Rico, filed suit against several companies and private individuals ("Defendants")[1] involved in the flexible polyurethane foam's industry[2] for allegedly conspiring to price-fix products from January 1, 1999 up to the present. (Docket No. 1). Plaintiff seeks injunctive relief, pursuant to the Clayton Act, 15 U.S.C. § 26, requesting this Court to enjoin Defendants from continuing its ongoing price-fixing conspiracy and demands damages in no less than $50,000,000.00, under the unjust enrichment equity doctrine. Id.

Pending before the Court are Defendants' motions to dismiss for failure to state a claim upon which relief can be granted (Docket No. 34), for lack of standing (Docket No. 39) and for lack of personal jurisdiction (Docket Nos. 35; 37). After reviewing the parties' submissions, record and applicable law, this Court **GRANTS** the joint motion to dismiss for failure to state

---

[1] Not all Defendants named in the Complaint have appeared before this Court. Each defendant is specifically named in section I.A.

[2] Flexible polyurethane foam is defined in the Complaint as "a commodity widely used for cushioning and insulation in a variety of goods, including but not limited to furniture, bedding, packaging, and flooring." (Docket No. 1 ¶ 3).

**Civil No. 18-1987 (GAG)**

a claim at Docket No. 34 and, consequently, finds that the motions to dismiss at Docket Nos. 35, 37, 39 are **MOOT**.

## I.    Relevant Factual and Procedural Background

For purposes of the joint motion to dismiss, the Court accepts as true all the factual allegations in the Complaint and construes all reasonable inferences in favor of Plaintiff. See Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998).

### A.  Defendants

The companies, and or affiliates, that sold flexible polyurethane foam throughout the United States, including the Commonwealth of Puerto Rico, during the period of the alleged price-fixing conspiracy are: (1) The Carpenter Company (or Carpenter Co.);[3] (2) Flexible Foam Products, Inc. (Flexible Foam Products);[4] (3) FXI Holdings, Inc., Foamex Innovations, Inc., or Foamex International, Inc. (Foamex or FXI);[5] (4) Future Foam, Inc. (Future Foam);[6] (5) Hickory Springs Manufacturing Company (Hickory Springs);[7] (6) Leggett & Platt Inc.

---

[3] Carpenter Co. is a company that manufacture and distribute flexible polyurethane foam for bedding, including cushioning, foam mattresses, and fibers, carpet cushion products, and flexible foam packaging. (Docket No. 1 ¶¶ 13-16). Defendant Carpenter Co. clarifies in its joint motion to dismiss that Plaintiff incorrectly identified it as "The Carpenter Company," when the corporation's name is Carpenter Co. Id. at 1.

[4] Flexible Foam Products is a company that manufactures flexible polyurethane foam and re-bond products serving customers in the bedding, flooring, furniture, packaging, and transportation industries. Id. ¶¶ 17-20. Defendant Flexible Foam Products has yet to appear in this case.

[5] FXI is a company with its principal place of business in Pennsylvania that provides flexible polyurethane foam for the home, healthcare, electronics, industrial, personal care and transportation markets. (Docket No. 1 ¶¶ 21-25). Defendant FXI clarifies that "Foamex Innovations, Inc." or "Foamex International, Inc." no longer exist and that FXI Holdings, Inc. is the entity appearing to move to dismiss the present case. (Docket No. 34 at 1).

[6] Future Foam is a company with its principal place of business in Iowa that produces flexible polyurethane foam products for the bedding, flooring, furniture, and packaging industries. (Docket No. 1 ¶¶ 26-28).

[7] Hickory Springs is one of the nation's largest integrated components manufacturers and suppliers for the furniture and bedding industries, with more than sixty operating facilities in the United States and throughout the world. Id. ¶¶ 29-33.

1

2

3

4

5

6

(Leggett);[8] (7) Mohawk Industries Inc. (Mohawk);[9] (8) Otto Bock Polyurethane Technologies, Inc. (Otto Bock);[10] (9) Scottdel Inc. (Scottdel);[11] (10) Woodbridge Foam Corporation, Woodbridge Sales & Engineering, Inc., (collectively "Woodbridge"),[12] and (11) Corporation ABC.[13] The claims against Defendants Vitafoam Products Canada Limited (Vitafoam Canada) and Vitafoam Inc. (collectively with Vitafoam Canada, "Vitafoam") were *dismissed with prejudice* pursuant to Plaintiff's notice of voluntary dismissal. (Docket Nos. 58; 59).

7

8

9

10

11

12

13

14

Similarly, according to the Complaint, the private individuals responsible for heading the alleged price-fixing conspiracy throughout the United States, including the Commonwealth of Puerto Rico, during the period in question are: (1) Louis Carson, former President of Scottdel; (2) David Carson, former Vice President, Manufacturing of Scottdel,[14] (3) John Doe, (4) Jane Doe, (5) and their conjugal partnership, whose identity is currently unknown yet may be responsible for the allegations set forth in Plaintiff's complaint. Id. ¶¶ 61-65. Lastly, Plaintiff mentions possible agents and co-conspirators that may have participated as co-conspirators in the violations alleged in the Complaint. (Docket No. 1 ¶¶ 66-69).

15

16

17

18

19

20

21

22

23

24

[8] Leggett is a company that manufactures flexible polyurethane foam and other components for the bedding and furniture industries. Id. ¶¶ 34-36.
[9] Mohawk is a company that manufactures flexible polyurethane foam and other components for the flooring industry. (Docket No. 1 ¶ 37).
[10] Otto Bock is a subsidiary of Otto Bock Holding GmbH & Co. KG, a German company. Id. ¶¶ 38-40. Defendant Otto Bock has yet to appear in this case.
[11] Scottdel is a company that manufactures bonded urethane carpet cushions since 1961 and now operates complete line of commercial and residential cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot. Id. ¶¶ 41-44. Defendant Scottdel has yet to appear in this case.
[12] Woodbridge are companies whose primary focus involves supplying flexible polyurethane foam for automotive components, but it also supplies flexible polyurethane foam for commercial and recreational transportation, building products, construction, packaging, and several consumer and industrial products. Id. ¶¶ 53-59.
[13] Corporation ABC is a corporate entity and who's the identity is currently unknown that may be responsible for the allegations set forth in Plaintiff's complaint. Id. ¶ 60.
[14] These individual defendants have yet to appear in this case.

1

B. The flexible polyurethane foam market

2

3 In 2008, over 590,000 metric tons of slabstock flexible polyurethane foam were

4 produced in the United States. (Docket No. 1 ¶ 74). Flexible polyurethane foam has a wide-

5 range of uses, yet it is most used in bedding and upholstery, while the more rigid variety is used

6 for products, thermal insulation and in automobile dashboards. Id. ¶ 77. The American

7 Chemistry Council estimated that the domestic revenue for polyurethane foam industry for 2015

8 was $28.2 billion. Id. ¶ 91. The Polyurethane Foam Association, a trade association in which

9 the non-private-individual Defendants are members, advances that, compared to polyurethane

10 foam, other alternative materials in the areas of economics, comfort potential, ease of use, and

11 durability, cannot be deemed as acceptable a substitute. Id. ¶ 98. Finally, according to Plaintiff,

12 there has been a recent trend towards consolidation in this industry where major players within

13 the industry have been active in acquiring smaller companies and other competitors over the

course of the last ten years. Id. ¶¶ 99-100.

14

C. The alleged conspiracy

15

16 The unraveling of the alleged conspiracy occurred in February 2010 when Vitafoam

17 voluntarily contacted the U.S. Department of Justice's (DOJ) Antitrust Division to self-report

18 evidence of misconduct amongst itself, other companies and individuals in the industry.

19 (Docket No. 1 ¶ 105). Vitafoam sought, and eventually received, acceptance into the DOJ's

20 Corporate Leniency Program. Id. Since that date, Vitafoam and its employees have been

21 cooperating with the DOJ's criminal investigation into illegal anticompetitive conduct in the

22 flexible polyurethane foam market. (Docket No. 1 ¶ 106). While seeking the corporate leniency

23 letter, and in connection with a Canadian government antitrust investigation, several current

and former Vitafoam employees agreed to be interviewed regarding the alleged price-fixing

24

conspiracy. (Docket No. 1 ¶ 108). These interviews revealed the mechanisms, participants, duration, and impact of the conspiracy. Id.

According to these interviews, Defendants established a practice where they would communicate and reach an agreement or understanding as to the percentage amount and timing of price increases and market allocation in the sale and supply of polyurethane foam. Id. at ¶ 109. The price increase discussions occurred approximately two to three times per-year and often coincided with the bi-annual meetings held by the Polyurethane Foam Association (PFA). Id. The general pretext used to explain the price increases was through an increase in raw material costs. Id. at ¶ 110. When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, they contacted each other to provide an opportunity to raise prices. Id. Defendants viewed price fixing as necessary because if they did not increase their foam prices by the same percentage amount, and at around the same period, then the attempted price increase would fail. Id.

During the period of the alleged conspiracy there has been an understanding among Defendants and their co-conspirators to collectively support supra-competitive prices; specifically, the percentage of price increases, the dates of the increases and how the conspirators would announce the increases with nearly the same effective dates. Id. at ¶ 112. Subsequently, price increase announcement letters were then mailed to customers, reflecting the prices determined. Id. Defendants policed these increases to ensure they were implemented amongst themselves and did not permit price reductions without consent of the overall group. (Docket No. 1 ¶ 112).

In the Complaint, Plaintiff explains in great length how former Vitafoam executives, particularly its former President and Vice President, coordinated and executed this price-fixing

conspiracy. (Docket No. 1 ¶¶ 113-153). The allegations described include discussions and transcripts of conversations that occurred by means of telephone, e-mails and in-person meetings. Id. at ¶ 117. These top executives, as detailed in the Complaint, participated in a conspiratorial conduct during this period alongside individuals employed by numerous competitors, including co-Defendants Carpenter, Otto Bock, Woodbridge, Flexible Foam, Hickory Springs, Scottdel, and Foamex. Id. at ¶ 120. Notably, an unnamed witness that participated in an investigation held by Canada's Commissioner of Competition confirmed the involvements of most Defendants in these price-fixing schemes. Id. at ¶¶ 130-139. It is alleged that Defendants also undertook substantial efforts to police the conspiracy and keep it secret. Id. at ¶¶ 154-207. In this regard, they took advantage of attending trade association meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings. Id. at ¶ 199. The Complaint also lays out various market factors that made the market for flexible polyurethane foam highly susceptible to anticompetitive practices and unlawful collusion. Id. at ¶ 208. These were: (1) limited competition; (2) inelastic demand due to lack of substitutes; (3) standardized commodity product with high degree of interchangeability; (4) opportunities to conspire. Id. at ¶¶ 209-221.

The Commonwealth puts forward that it did not discover nor could have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged prior to disclosure in 2010 of federal agencies' raids of certain Defendants' facilities. Id. at ¶ 222. Plaintiff stresses that, except for Vitafoam which sought leniency from the DOJ and Scottdel that filed for bankruptcy and went into liquidation, there was no indication that any of the other Defendants has taken affirmative action to leave the conspiracy. (Docket No. 1 ¶ 207).

1   Finally, the Commonwealth pleads that the unlawful conspiracy had the effect of: (1)

2   maintaining prices charged by Defendants at an artificially high and supra-competitive levels;

3   (2) having them pay more for products manufactured with polyurethane foam than they would

4   have paid in a competitive marketplace, and (3) depriving them of the benefits of free, open and

5   unrestricted competition in the market for polyurethane foam. (Docket No. 1 ¶¶ 299-232). All

6   of these occurred, during and throughout the period in question, as the Government indirectly

7   purchased Defendants' polyurethane foam in Puerto Rico. Id. ¶ 230.

8       D.   Multi-District Antitrust Litigation, Settlements and Fines

9       The Court takes judicial notice, pursuant to FED. R. EVID. 201,[15] of the following facts:

10  After Vitafoam voluntarily approached the DOJ's antitrust division in early 2010, lawsuits were

11  filed in several district courts seeking class action status and alleging a price-fixing conspiracy

12  in the foam industry. See Peter Reap, Antitrust News: Companies Which Purchased Flexible

13  Polyurethane Foam Allege Price Fixing Conspiracy, Wolters Kluwer Antitrust Law Daily, 2013

14  WL 5861997. Most of these actions were consolidated in the Northern District of Ohio. See In

15  re: Polyurethane Foam Antitrust Litig., 753 F. Supp. 2d 1376 (U.S. Jud. Pan. Mult. Lit. 2010).

16  Many of these lawsuits concluded with million-dollar settlements that led to the dissolution or

17  bankruptcy of some companies.[16] Similarly, various companies in the industry faced criminal

18

19

20

21

22

23

24

---

[15] At the motion to dismiss stage, a Court may take judicial notice of the fact that press coverage, prior lawsuits or regulatory filings contained certain information, without regard to the truth of the contents. See Rodi v. S. New England Sch. Of Law, 389 F.3d 5, 12-19 (1st Cir. 2004). See also Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

[16] See Polyurethane foam makers in $128.5 mln US price-fixing accords, Reuters (June 22, 2015), https://www.reuters.com/article/polyurethane-settlement/polyurethane-foam-makers-in-128-5-mln-us-price -fixing-accords-idUKL1N0Z829 M20150622; Jonathan Stempel, Polyurethane foam makers pay $275.5 million to end price-fixing cases, Reuters (May 19 2015), https://www.reuters.com/article/us-polyurethane-settlement/polyurethane-foam-makers-pay-275-5-million-to-end-price-fixing-cases-idUSKBN0O42K8201 50519. See also In re Polyurethane Foam Antitrust Litig., 135 F. Supp. 3d 679 (N.D. Ohio 2015); In re Polyurethane Foam Antitrust Litig., Civil Case No. 10-MD-2196, 2015 WL 1639269 (N.D. Ohio 2015).

1
2
prosecution for the price-fixing scheme and were fined by countries in North America and Europe.[17]

3
E. Defendants' Motions to Dismiss

4
5
6
7
8
9
10
11
12
13
Defendants Carpenter, FXI, Future Foam, Hickory Springs, Mohawk, Leggett, and Woodbridge filed a joint motion to dismiss for failure to state a claim, under FED. R. CIV. P. 12(b)(6), arguing that the allegations contained in the Complaint offer no sufficient legal basis to issue an injunction that would stop the alleged anticompetitive conduct that has not occurred since 2010. (Docket No. 34). Similarly, they posit that the Commonwealth may not sue for unjust enrichment to revive a time-barred antitrust damages claim because the Puerto Rico Antitrust Act ("PRAA"), P.R. LAWS ANN. tit. 10, §§ 257 *et seq.*, provides an adequate legal remedy to their alleged injuries. Id. Finally, Defendants contend that Plaintiff cannot sue in *parens patriae* capacity because it lacks statutory standing to litigate the individual claims of Puerto Rico residents. Id.

14
15
16
17
18
19
20
Defendants Woodbridge, Hickory Springs and FXI filed additional motions to dismiss against Plaintiff on different grounds to those articulated in the joint motion. (Docket Nos. 35, 37, 39). Woodbridge mainly argues that the Government's conspiracy allegations cannot be related to its business activities in the Commonwealth; thus, under FED. R. CIV. P. 12(b)(2), the Court lacks personal jurisdiction over the company. (Docket No. 35). Likewise, it also pleads that both federal and Commonwealth antitrust law claims should be dismissed for lack of proper

21
22
23
24
[17] See Three Foam Manufacturers Plead Guilty in Price Fixing Scheme, Department of Justice (June 27, 2014), https://www.justice.gov/opa/pr/three-foam-manufacturers-plead-guilty-price-fixing-scheme; European Commission, Antitrust: Commission fines producers of foam for mattresses, sofas and car seats € 114 million in cartel settlement (Jan. 29, 2014), https://ec.europa.eu/commission/presscorner/detail/en/IP_14_88; Polyurethane foam, Government of Canada (Jan. 6, 2012), https://www.competitionbureau.gc.ca/eic/site/cb-bc.nsf/eng/02585.html.

venue, pursuant to FED. R. CIV. P. 12(b)(3). (Docket No. 35). Similarly, Hickory Springs posits that the Court lacks specific jurisdiction, under FED. R. CIV. P. 12(b)(2), because Plaintiff's claims are not related to any activity carried out by Hickory Springs in Puerto Rico. (Docket No. 37). Notably, Hickory Springs puts forward that the polyurethane foam products at issue were sold into the Commonwealth by third parties; hence, there is no nexus between Plaintiff and Hickory Springs. Id. Lastly, FXI argues that Plaintiff cannot identify facts that would establish Article III standing against it given that Plaintiff fails to sue an existing corporate entity, Foamex. (Docket No. 39). Specifically, FXI details Foamex's bankruptcy procedures that ended up in its dissolution and avers that Plaintiff never mentions FXI in the Complaint neither does it allege a real, immediate, and significant threat of injury. Id.

The Government filed responses in opposition to all motions to dismiss (Docket Nos. 60, 61) and Defendants replied thereafter. (Docket Nos. 68, 69, 70, 71).

## II. Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, FED. R. CIV. P. 12(b)(6), the Court analyzes the complaint in a two-step process under the context-based "plausibility" standard established by the Supreme Court. See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). First, the Court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz, 669 F.3d 50 at 55. A complaint does not need detailed factual allegations, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678-79. Second, the court must then "take the complaint's well-[pleaded] (i.e., non-

1  conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's

2  favor, and see if they plausibly narrate a claim for relief." <u>Schatz</u>, 669 F.3d at 55. Plausible,

3  means something more than merely possible, and gauging a pleaded situation's plausibility is

4  a context-specific job that compels the court to draw on its judicial experience and common

5  sense. <u>Id.</u> (citing <u>Iqbal</u>, 556 U.S. at 678-79). This "simply calls for enough facts to raise a

6  reasonable expectation that discovery will reveal evidence of" the necessary element.

7  <u>Twombly</u>, 550 U.S. at 556. "[W]here the well-pleaded facts do not permit the court to infer

8  more than the mere possibility of misconduct, the complaint has alleged—but it has not

9  'show[n]'—'that the pleader is entitled to relief.'" <u>Iqbal</u>, 556 U.S. at 679 (quoting FED. R. CIV.

10  P. 8(a)(2)). If, however, the "factual content, so taken, 'allows the court to draw the reasonable

11  inference that the defendant is liable for the misconduct alleged,' the claim has facial

12  plausibility." <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011) (quoting

13  <u>Iqbal</u>, 556 U.S. at 678).

14  **III.    Discussion**

15        Defendants primarily argue that Plaintiff cannot show imminent harm and rely on the

16  analysis set forth in different complex litigation antitrust cases. (Docket No. 34 at 5-6). <u>See</u> <u>In</u>

17  <u>re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6 (1st Cir. 2008); <u>In re Relafen</u>

18  <u>Antitrust Litig.</u>, 221 F.R.D. 260 (D. Mass. 2004); <u>Petrolera Caribe, Inc. v. Arco Caribbean, Inc.</u>,

19  754 F.2d 404 (1st Cir. 1985). They assert that Plaintiff's theory of an ongoing industry-wide

20  conspiracy requires an overt act sufficient to toll and restart the statute of limitations. (Docket

21  No. 34-1 at 5-6). They argue that this has yet to occur. <u>Id.</u> Moreover, Defendants contend that

22  the doctrine of laches bars the Government's claims because it had knowledge about the alleged

23  conspiracy as early as 2010 meaning that the Clayton Act Section 4 (Damages)'s four-year

24

1
2
statute of limitations, 15 U.S.C. § 15b, expired prior to filing this lawsuit on December 20,

2018. Id. at 7.

3
4
5
6
7
8
9
10
Plaintiff holds, in opposition, that in the context of antitrust litigation the requirements for standing to pursue an injunctive relief are "less stringent" than those for standing to claim damages. (Docket No. 61 at 4). At this early litigation stage, the Government avers that it describes a plausible set of facts about the conspiracy: how it worked and the active policing that each Defendant engaged in to ensure everybody involved complied with the agreement. Id. Plaintiff also puts forward that not issuing an injunction may result in a recurring incident that could evade judicial review. Id. at 5. Lastly, the Government holds that it plausibly suffers an imminent threat of injury. Id.

11
12
13
14
15
16
17
In their reply, Defendants posit that the Government offers a legal conclusion about a continuing conspiracy without supporting factual allegations from the past nine years. (Docket No. 69). They insist that the Court should not enjoin all potential and future antitrust law violations. Id. As to the evading judicial review argument, Defendants assert that the mootness doctrine exception explained in the opposition is irrelevant to the case at hand. Id. Finally, Defendants aver that Plaintiff failed to oppose their laches argument, and have thus, waived its right to contest it. Id.

18
19
20
21
22
23
24
Given the early stage of the proceedings, the plausibility standard requires the Court to consider if the allegations set forth in the Complaint are "more than merely possible." Schatz, 669 F.3d at 55. As it is well-known this "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" concerning the necessary elements to prove the relief plaintiff seeks. Twombly, 550 U.S. at 556. For a plaintiff to show an entitlement to relief "a complaint must contain enough factual material to raise a right to relief above the

speculative level." <u>Ocasio-Hernández</u>, 640 F.3d at 12 (citation omitted); <u>see also</u> <u>Twombly</u>, 550

U.S. at 555. A well-plead complaint "may proceed even if . . . a recovery is very remote and

unlikely" yet it may not, *if the remedy sought is not available*. <u>Ocasio-Hernández</u>, 640 F.3d at

12-13. Bearing this in mind, in this case, Plaintiff seeks an injunctive relief in the context of an

antitrust case. The Court's task requires analyzing if the pleadings in the Complaint can

plausibly establish this cause of action upon which relief may be granted.

### A. Injunctive Relief

Plaintiff invokes Section 16 of the Clayton Act which provides that "[a]ny person, firm,

corporation, or association shall be entitled to sue for and have injunctive relief . . . against

threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. To meet this

burden Plaintiff must "demonstrate a significant threat of injury from an impending violation

of the antitrust laws or from a contemporary violation likely to continue or recur." <u>Zenith Radio</u>

<u>Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 130 (1969) (citations omitted). The threatened

injury must be one for which plaintiff would be entitled to compensation if the injury actually

occurred. <u>Cargill, Inc. v. Monfort of Colo., Inc.</u>, 479 U.S. 104, 111-13 (1986). The First Circuit,

when analyzing the elements for an antitrust injunction and its standing requirements, held that:

> Section 16's requirement of "threatened injury" dovetails with Article III's
> requirement that in order to obtain forward-looking relief, a plaintiff must face
> a threat of injury that is both real and immediate, not conjectural or hypothetical.
> Past exposure to illegal conduct does not in itself show a present case or
> controversy regarding injunctive relief . . . if unaccompanied by any continuing,
> present adverse effects.

<u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 14 (1st Cir. 2008)

(citations and internal quotation marks omitted); <u>see also</u> <u>In re Nexium (Esomeprazole)</u>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Antitrust Litig., 845 F.3d 470, 474-75 (1st Cir. 2017); O'Shea v. Littleton, 414 U.S. 488, 494-95 (1974).

Plaintiff avers that it meets these requirements as it detailed Defendants' alleged conspiracy scheme and its ongoing presence in the Commonwealth. (Docket No. 61 at 4). Defendants, on the other hand, argue that the Government fails to plead the necessary element of imminent harm and that this claim is time-barred, or alternatively, the laches doctrine should be applied because there is no allegation in the Complaint dating subsequent to 2010, when Plaintiff learned about the alleged conspiracy. (Docket No. 69 at 2).

When entertaining a suit under the Clayton Act's Section 4 (damages), a Court shall determine if it was filed within the four-year statute of limitations. 15 U.S.C. § 15b. These claims accrue "when a defendant commits an act that injures a plaintiff's business." Zenith Radio Corp., 401 U.S. at 338. The Supreme Court has delineated at least two distinct exceptions to the four-year statute of limitations in antitrust actions: (1) the continuing violation and (2) the speculative damages exception. Id. at 338-342. While Plaintiff fails to invoke either exception, the Court will consider whether the continuing conspiracy violation exception applies.

Where the claim is a continuing conspiracy violation, "each time a plaintiff is injured by an act of the defendants [,] a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." Id. In the context of price-fixing allegations, this implies that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act. However, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused

by old overt acts outside the limitations period." See Klehr v. A.O. Smith Corp., 521 U.S. 179, 188 (1997). See also Pan-Am. Tel. Co. v. Municipality of San Juan, Civil Case No. 09-1256 (ADC/BJM), 2012 WL 13027982 at *4 (D.P.R. 2012).

Notwithstanding this analysis, several District and other Circuit courts have held that there is no statute of limitations for injunctive relief claims under Section 16 of the Clayton Act and that rather, the equitable defense of laches applies. See e.g. Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc., 392 F.3d 265 (8th Cir. 2004); Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 2014-1 Trade Cas. (CCH) ¶ 78771, 2014 WL 1329359 (S.D. Fla. 2014) aff'd, 797 F.3d 1248 (11th Cir. 2015); Oliver v. SD-3C LLC, 751 F.3d 1081 (9th Cir. 2014). When computing the laches period, the four-year statute of limitation is used as a "guideline." Oliver 751 F.3d at 1086. Therefore, in applying laches, the Court looks to the same legal rules that animate the four-year statute of limitations. Id.

The doctrine of laches, "which penalizes a litigant for negligent or wilful failure to assert his rights," Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972), requires proving "(1) lack of diligence by the party against whom the defense is asserted and (2) prejudice to the party asserting the defense." Museum of Fine Arts, Bos. v. Seger-Thomschitz, 623 F.3d 1, 10 n. 9 (1st Cir. 2010). Nevertheless, the laches doctrine applies only where the plaintiff knew or should have known of the infringing conduct. Valmor Prods., 464 F.2d at 204.

In light of the above, the Court agrees with Defendants' position that Plaintiff has failed to present a cogent argument for establishing an impeding, contemporary and threatened harm. Although an alleged price-fixing conspiracy could have possibly occurred throughout the Nation, as the multi-district antitrust lawsuits, settlement agreements and monetary fines reveal,

it is apparent from the face of the Complaint that the last injurious act in this entire scheme befell *almost* ten years ago; specifically, in the Summer of 2010 (Docket No. 1 at 136-188). Not a single pleading references a recent act (from 2011 to 2018), nor does it relate to the Defendants' businesses in the Commonwealth of Puerto Rico. Simply adding the phrase, "including Puerto Rico" at the end of every other allegation in the Complaint is not specific enough to survive the burden at this stage. (Docket No. 1). As the First Circuit has held, in similar antitrust cases, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d at 14. Consequently, Plaintiff has failed to plausibly establish that injunctive relief should be granted. The Court will not proceed with almost decade-old allegations, as Defendants correctly point out. (Docket No. 34 at 5-8).

Plaintiff's request for injunctive relief is time-barred and the laches doctrines applies. There is *no doubt* that more than four years have elapsed since the factual allegations detailed in the Complaint. Under the conspiracy exception, there has not been an overt act since the Summer of 2010 that would have tolled this cause of action. When considering theses defenses, the Ninth Circuit has held that to re-start a statute of limitations, there must be a new overt act which: (1) is "new and independent . . . [and] not merely a reaffirmation of a previous act and (2) inflict[s] new and accumulating injury on the plaintiff." Oliver, 751 F.3d at 1086. None of these has occurred in the present case.

Additionally, under the First Circuit's laches analysis, the Commonwealth must or should have known of the infringing conduct, given the allegations in the Complaint date back to at least four years prior to its filing. In the Complaint, Plaintiff contradicts itself when it

1
2
3
4
5
6
7

alleges that: "Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein *prior to disclosure in 2010 of the raids by government agencies of certain Defendants' facilities.*" (Docket No. 1 ¶ 222) (emphasis added). It admits that it learned about the alleged conspiracy in 2010 yet did not file suit until December 20, 2018. Once again, an injunctive relief claim that relies on general and vague descriptions of an "ongoing conspiracy" without a new and independent act, fails to overcome the Rule 12(b)(6) standard.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Although district courts are reluctant to dismiss antitrust injunction claims based on ongoing conspiracies, this Court is mindful "that proceeding to antitrust discovery can be expensive" and thus "retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." Twombly, 550 U.S. at 558 (citations and internal quotations marks omitted); see also Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17 (1983). In Twombly, the Supreme Court cautioned about "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." Twombly, 550 U.S. at 558 (citing Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (C.A.7 1984)). The present case would likely involve a lengthy and costly discovery as in the consolidated cases on the same alleged price-fixing conspiracy held before the Northern District of Ohio. After four years of litigation, the District Court for the Northern District of Ohio highlighted the fact that "[m]illions of pages of discovery, hundreds of fact and expert witness depositions, and extensive motion practice [had] ensued." In re Polyurethane Foam Antitrust Litig., 152 F. Supp. 3d 968, 974 (N.D. Ohio 2015). The same would occur here.

24

Finally, the Court is concerned that the present case could be a needless fishing expedition. See In re Carbon Black Antitrust Litig., Case No. 03-10191 (DPW), 2005 WL 102966 at *5 (D. Mass. 2005); see also Eastern Food Services, Inc. v. Pontifical Catholic Univ. Services Assoc., Inc., 357 F.3d 1, 9 (1st Cir. 2004) ("[T]he cases . . . say that it is not enough merely to allege a violation in conclusory terms, that the complaint must make out the rudiments of a valid claim, and that discovery is not for fishing expeditions."). In fact, how does Plaintiff plan to carry-out an effective and complete discovery if it voluntarily dismissed all claims against Vitafoam, the alleged mastermind in this ongoing price-fixing conspiracy and the Defendant most mentioned in the Complaint? (Docket No. 58; 59). It simply would not be able.

For the all foregoing reasons, this Court **GRANTS** Defendants joint motion to dismiss at Docket No. 34 as to Plaintiff's request for injunctive relief.

**B. Unjust or Undue Enrichment Doctrine and Indirect Purchaser Claims**

Given the subsidiary nature of the unjust enrichment doctrine, Defendants aver that the Government may not pursue this claim because the Puerto Rico Antitrust Act ("PRAA"), P.R. LAWS ANN. tit. 10, § 268, provides a legal remedy. It further puts forward that the Court has previously dismissed an antitrust claim "cloaked as unjust enrichment" in Rivera-Muñiz v. Horizon Lines Inc., 737 F. Supp. 2d 57 (D.P.R. 2010). (Docket No. 34-1 at 9).

Plaintiff opposed this argument asserting that an indirect purchaser antitrust claim is not available under Puerto Rico law and hence it can only sue pursuant to the unjust enrichment doctrine. (Docket No. 61 at 6-7). The Government posits that Defendants rely on Rivera-Muñiz's analysis on this issue, while other federal courts have held that Puerto Rico has not

rejected <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977).[18] (Docket No. 61 at 6-9). Plaintiff

posits that without an express repeal of <u>Illinois Brick</u>, indirect purchaser antitrust claims are not

available in this jurisdiction. <u>Id.</u> Defendants stress in their reply that Plaintiff offers no analysis

grounded on Commonwealth law that departs from the Court's prior decision in <u>Rivera-Muñiz</u>,

which held that liberally construing antitrust claims is inconsistent with limiting indirect

purchaser standing. (Docket No. 69 at 5).

       The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue

enrichment doctrine in <u>Ortiz-Andújar v. Commonwealth of Puerto Rico</u>, 22 P.R. Offic. Trans.

774, 122 P.R. Dec. 817 (P.R. 1988). This civil law equity doctrine can be invoked "when the

laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be

rationally explained by the prevalent body of laws." <u>Id.</u> (internal quotation marks omitted).

There are five elements to an unjust enrichment action: "(1) existence of enrichment; (2) a

correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment, and

(5) absence of a legal precept excluding application of enrichment without cause." <u>See</u> <u>Hatton</u>

<u>v. Mun. de Ponce</u>, 1994 P.R.-Eng. 909, 605, 134 P.R. Dec. 1001, 1010 (P.R. 1994); <u>see also</u>

<u>Puerto Rico Tel. Co. v. SprintCom, Inc.</u>, 662 F.3d 74, 97 (1st Cir. 2011).

       Defendants focus primarily on the doctrine's fifth element, or the absence of thereof,

arguing that the Government had a legal remedy under PRAA's Section 268. Specifically, this

---

[18] In <u>Illinois Brick</u>, several brick companies allegedly conspired to raise prices to masons who in turn passed the inflated prices along to the subcontractors on public works projects; ultimately harming the indirect purchasers: the state and its taxpayers. <u>Illinois Brick Co.</u>, 431 U.S. at 726-27. The Supreme Court held that indirect purchasers may not recover damages in price-fixing cases and even if direct purchasers have "passed on" some or all the overcharges to indirect purchasers. <u>Id.</u> at 744-46. As a policy matter, the Court found it necessary to restrict the remedy to direct purchasers. <u>Id.</u> In response to the Court's decision, several states enacted laws permitting indirect purchasers to sue under state antitrust laws. <u>See</u> Daniel R. Karon, <u>"Your Honor, Tear Down That Illinois Brick Wall!" the National Movement Toward Indirect Purchaser Antitrust Standing and Consumer Justice</u>, 30 Wm. Mitchell L. Rev. 1351, 1360-63 (2004) (explaining different states <u>Illinois Brick</u> "repealer statutes"); <u>California v. ARC Am. Corp.</u>, 490 U.S. 93 (1989).

section provides that "[a]ny person who shall be injured in his business or property by any other person, by reason of acts or intended acts, forbidden or declared to be unlawful by the provisions of this chapter . . . may sue therefor . . . and shall recover threefold the damages by him sustained." P.R. LAWS ANN. tit. 10, § 268(a).[19] Furthermore, it provides that "[t]he judicial action to recover damages . . . [the action] shall be commenced within four (4) years after the cause of action accrued." Id. Under Defendants' theory, Plaintiff had a remedy under PRAA yet failed to file suit within the four-year statute of limitations and cannot now disguise its time-barred action using the unjust enrichment doctrine. (Docket No. 34-1 at 9-10). The Government opposes this argument and posits that an indirect purchaser antitrust claim is not available under Puerto Rico law and thus the only remedy available is unjust enrichment. (Docket No. 61 at 6-9).

The Court disagrees with Plaintiff's arguments on indirect purchaser standing. As a threshold matter, in Rivera-Muñiz the undersigned explicitly addressed the issue of direct and indirect purchaser antitrust standing under Commonwealth law and held that "although federal jurisprudence has implied special standing requirements into private antitrust actions, Puerto Rico explicitly rejects any such limitations." Rivera-Muñiz, 737 F. Supp. 2d at 61 (D.P.R. 2010) (citations and internal quotation marks omitted). Relying on Pressure Vessels of P.R., Inc. v. Empire Gas de P.R., 1994 P.R.-Eng. 909, 547, 137 P.R. Dec. 497 (P.R. 1994), the Court held that "because Puerto Rico liberally construes its standing requirements in private antitrust cases, it is immaterial whether Plaintiffs are direct or indirect purchasers." Id. After the Court's ruling in Rivera-Muñiz, Defendants in that case moved to certify a question to the Puerto Rico

---

[19] It is worth noting that this statutes language is practically identical to the Clayton Act's Section 4 (damages), 15 U.S.C. § 15.

Supreme Court as to whether indirect purchasers have standing to sue under PRAA. This Court

denied that request:

> The Puerto Rico legislature enacted PRAA in 1964. <u>Pressure Vessels of P.R., Inc. v. Empire Gas de P.R.</u>, 137 P.R. Dec. 497, 519 (1994). Since then, federal precedents have limited standing in private antitrust actions under federal law to direct purchasers. <u>See</u> <u>Ill. Brick Co. v. Illinois</u>, 431 U.S. 720, 746 (1977). Without citing <u>Illinois Brick</u> explicitly, the Puerto Rico Supreme Court rejected such limitations on standing for the purpose of private antitrust actions under PRAA. <u>See</u> <u>Pressure Vessels</u>, 137 P.R. Dec. at 519 (citing federal precedents limiting antitrust standing that postdate enactment of PRAA in 1964). According to the Commonwealth court, the legislative intent under PRAA must be inferred from the state of federal case law in 1964 -when federal precedents tended to favor liberal standing requirements in private antitrust actions. <u>Id.</u> Because the Puerto Rico Supreme Court has unequivocally rejected limitations to private antitrust standing under PRAA, this court must deny Defendants' motion for certification. <u>See</u> Romero, 204 F.3d at 305-06.

<u>Rivera-Muñiz v. Horizon Lines Inc.</u>, Civil No. Case 09-2081 (GAG), 2010 WL 3703737 at *1

(D.P.R. 2010) (footnotes omitted). Additionally, the Court advanced that if defendants

"wish[ed] to amend the standing requirements under PRAA, they must appeal to the Puerto

Rico legislature or present their arguments in a proper judicial venue in the Commonwealth."

<u>Id.</u> at 1, n. 2.

Following this decision, as Plaintiff points out, several district courts have rejected the

Court's <u>Pressure Vessels of P.R., Inc.</u> reading. <u>See e.g.</u> <u>In re Opana Er Antritrust Litig.</u>, 162 F.

Supp. 704 (N.D. Ill. 2016); <u>United Food & Commercial Workers Local 1776 & Participating</u>

<u>Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.</u>, 74 F. Supp. 3d 1052 (N.D.

Cal. 2014); <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>, 599 F. Supp. 2d 1179 (N.D. Cal. 2009).

While other jurisdictions, and rather *recently*, have agreed with it. <u>See e.g.</u> <u>In re Zetia</u>

<u>(Ezetimibe) Antitrust Litig.</u>, Civil Case No. 18-MD-2836, 2019 WL 1397228 (E.D. Va. 2019),

<u>report and recommendation adopted as modified</u>, 400 F. Supp. 3d 418 (E.D. Va. 2019);

<u>Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc</u>, Civil Case No. 15-6549

(CM), 2018 WL 7197233 (S.D.N.Y. 2018). Nevertheless, these decisions are not binding, nor do they persuade the undersigned to reconsider its holding in <u>Rivera-Muñiz</u>. More so, following the decision in <u>Rivera-Muñiz</u>, the Puerto Rico Supreme Court has not ruled upon a similar issue, nor has the Commonwealth's Legislature amended the PRAA to restrict indirect purchaser standing.

Accordingly, under the current state of Commonwealth law, there exists a liberal construction of who and whom possess standing to bring to court an antitrust case. If there is no distinction between direct or indirect purchaser, then the Government should have sought damages pursuant to PRAA for the alleged price-fixing conspiracy and not under the unjust enrichment doctrine. In <u>Rivera-Muñiz</u>, the Court also decided that the unjust enrichment doctrine is "subsidiary to other remedies provided by law and is unavailable if the plaintiff may seek other forms of relief. Because PRAA affords a remedy to private litigants who are injured by antitrust violations, Plaintiff[] may not simultaneously seek relief under the theory of unjust enrichment." <u>Rivera-Muñiz</u>, 737 F. Supp. 2d 57 at 65-66. The Court stands by this reasoning.

Consequently, the Court **GRANTS** Defendants motion to dismiss as to their request for damages under the unjust enrichment doctrine.

### C. *Parens patriae* **standing**

Finally, Defendants argue that the Government lacks *parens patriae* standing to sue because there is no express statute granting it and neither can it satisfy the Supreme Court's test set forth in <u>Alfred L. Snapp & Son, Inc. v. P.R., ex rel., Barez</u>, 458 U.S. 592 (1982). (Docket No. 34 at 10-12). Plaintiff opposes contending that it has a legitimate state interest in recovering for the economic harm that Defendants have caused through their price-fixing conspiracy and

that it meets all requirements set under <u>Snapp</u>. (Docket No. 61 at 9-11). In its reply, Defendants advances that Plaintiff lacks a quasi-sovereign interest. (Docket No. 69 at 8-10).

Federal antitrust law, specifically Section 16 of the Clayton Act, provides statutory authorization for claims brought by a state or territory in its capacity as *parens patriae*. 15 U.S.C. §§ 15g-15h; <u>Georgia v. Pennsylvania R.R.</u>, 324 U.S. 439, 447 (1945); <u>see also</u> <u>California v. American Stores Co.</u>, 495 U.S. 271 (1990); <u>Hawaii v. Standard Oil Co. of Cal.</u>, 405 U.S. 251, 258-66 (1972). However, no Commonwealth statute nor Puerto Rico Supreme Court precedent explicitly provides for *parens patriae* standing to present unjust enrichment claims. Had the Government timely filed this suit and would have sought damages under PRAA, then it may have had *parens patriae* standing. However, like an unjust enrichment claim, the Puerto Rico Supreme Court has not addressed this issue and no Commonwealth statues directly allows *parens patriae* standing for antitrust claims, as it does for other civil claims. <u>See e.g.</u> <u>Class Suit for Consumers of Goods and Services Act</u>, P.R. LAWS ANN. tit., 32 § 3341 ("There is recognized the right to consumers of goods and services and/[or] [] the Commonwealth of Puerto Rico, through their agencies, dependencies and instrumentalities in their capacity of '*parens patriae*' to file a class suit on behalf of said consumers by reason of damages.").

### D. Motions to Dismiss for Lack of Personal Jurisdiction and Proper Venue (Docket Nos. 35 and 37) and Motion to Dismiss for Lack of Standing (Docket No. 39)

The Court need not address these motions as Plaintiff's claims have been dismissed on other grounds. For the foregoing reasons, the Court finds the motions to dismiss at Docket Nos. 35, 37, 39 are **MOOT**.

## IV.    Conclusion

As explained above, the costs of complex antitrust lawsuits require diligence and timeliness. Plaintiff lacked both and, thus, failed to plausibly state a claim upon which relief may be granted. Consequently, the Court **GRANTS** the joint motion to dismiss for failure to state a claim at Docket No. 34.

According to the case' record, remaining Defendants Flexible Foam Products, Otto Bock, Scottdel, Louis Carson and David Carson have not been served with process. Plaintiff shall inform the Court, **on or before March 5, 2020**, any action it has taken to pursue its claims against them. Otherwise, the Court will proceed to enter judgment accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico this 27th of February, 2020.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge